## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| POWERHOUSE COMMUNICATIONS, LLC, | : : | Civil No. 1:24-CV-00565 |
| | : | |
| Plaintiff, | : : | |
| v. | : : | |
| MIDSTATE COMMUNICATION CONTRACTORS, INC., and CLAYTON LAWRENCE, | : : : : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is a motion to dismiss the amended complaint or, in the alternative, to transfer venue filed by Defendants Midstate Communication Contractors, Inc. and Clayton Lawrence (collectively, "Defendants"). (Doc. 11.) Defendants seek to dismiss the entire amended complaint, pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3), and to dismiss Counts VI and VII pursuant to Rule 12(b)(6). The court finds the facts alleged in the amended complaint justify exercising personal jurisdiction over Defendants as to all claims. The court further finds that the Middle District of Pennsylvania is the proper venue for this action. Finally, the court determines that Count VI of the amended complaint fails to state a claim, but Count VII survives the 12(b)(6) challenge. Thus, for the reasons that follow, the court will grant in part and deny in part Defendants' motion to dismiss or, in the alternative, to transfer venue. (Doc. 11.)

1

**FACTUAL BACKGROUND**

**A. Powerhouse's Business Operations Generally**

Plaintiff, Powerhouse Communications, LLC ("Powerhouse"), is a Pennsylvania-based contractor in the business of "constructing and installing fiber-optic networks throughout Pennsylvania and other states." (Doc. 9, ¶ 8.) While Powerhouse operates in multiple states, Powerhouse has only one office—located in New Cumberland, Pennsylvania—which serves as its "operational headquarters." (*Id.* ¶ 1.) Powerhouse's headquarters houses all company departments, including, *e.g.*, human resources, operations, and personnel. (*See id.*) Accordingly, all Powerhouse personnel are centrally managed from its Pennsylvania headquarters. (Doc. 17-3, ¶ 8.) For instance, its Pennsylvania headquarters is where Powerhouse makes hiring decisions. (Doc. 9, ¶ 1.) So, too, Powerhouse administers all employee benefits from its headquarters such that all employees must contact headquarters "to resolve administrative issues." (Doc. 17-3, ¶¶ 9–10.)

**B. Powerhouse Hires Lawrence**

In early 2021, Defendant Clayton Lawrence ("Lawrence")—an Arkansas resident—sought employment with Powerhouse and completed a Powerhouse job application. (Doc. 17-3, ¶ 15.) Powerhouse did not contact Lawrence about potential employment before he completed the job application; rather, Lawrence

initiated contact with Powerhouse through his application.[1]  (Doc. 17-2, ¶ 46.)

Powerhouse subsequently hired Lawrence.  (Doc. 9, ¶ 12).

    At the outset of Lawrence's employment, Powerhouse issued certain

company property to Lawrence, and he signed several policy documents in turn.

Powerhouse issued Lawrence a company credit card, for which he signed a "Credit

Card Policy" bearing Powerhouse letterhead and its Pennsylvania headquarters

address.  (Doc. 17-3, pp. 15–16.)[2]  Powerhouse also issued Lawrence a company

fleet truck registered in Pennsylvania and bearing Pennsylvania license plates for

"work-related travel."  (*Id.* ¶ 19.)  In connection with the fleet truck, Lawrence

signed a "Policy on Fleet Safety" and a "vehicle maintenance procedure," both of

which bore Powerhouse letterhead and Powerhouse's headquarters address.  (*Id.*

pp. 18–22, 28.)  To pay for his fleet truck's gas, Powerhouse issued Lawrence a

"company gas card," and Lawrence signed a "Fuel Card Policy," also bearing

Powerhouse letterhead and Powerhouse's headquarters address.  (*Id.* p. 24.)

Powerhouse also issued Lawrence a Pennsylvania-registered RV, which Lawrence

physically picked up at Powerhouse's headquarters during a visit in September

2022.  (*See* Doc. 17-2, ¶ 49.)  This was Lawrence's sole visit to Powerhouse's

---

[1] Lawrence disputes Powerhouse's factual assertion.  He claims that he "did not contact Powerhouse" but, rather, he received an application from Powerhouse after his former boss reached a supposed agreement with Powerhouse about staffing a project in Iowa.  (Doc. 12-1, ¶¶ 4–6.)  Factual disputes at this stage of litigation must be resolved in favor of Powerhouse.

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

headquarters.  (Doc. 12-1, ¶ 8.)  His visit lasted "several days" and involved

attending meetings, picking up "materials," receiving trainings, and enjoying

Powerhouse's annual company picnic.  (Doc. 9, ¶ 32; Doc 17-2, ¶ 48.)

Also as part of his employment, Lawrence signed a "Non-Solicitation

Policy."  (Doc. 9-4, p. 2.)  The non-solicitation policy states, in relevant part, that

during his employment and "for a period of three years thereafter":

> [Lawrence] shall not, directly or indirectly, whether on behalf of
> himself or anyone else: (i) induce or attempt to induce a business
> associate of Powerhouse Communications to refrain from business with
> Powerhouse Communications or its affiliates; (ii) use for his benefit or
> disclose the name and/or requirements of any such business associate
> to any other person or persons, natural or corporate; or (iii) solicit any
> of the employees of [Powerhouse] to leave the employ of [Powerhouse]
> or hire anyone who is any employee of [Powerhouse] or has worked for
> [Powerhouse].

(*Id.*)

During his employment at Powerhouse, Lawrence worked as a project

manager on fiber optic installation projects in Iowa, Arkansas, and Nebraska.

(Doc. 9, ¶ 34; Doc. 12-1, ¶ 7.)  Lawrence's job responsibilities included, in part,

helping Powerhouse "prepar[e] bids for new business projects."  (Doc. 9, ¶ 35.)  To

do so, Lawrence would estimate a proposed project's cost using a variety of

internal Powerhouse data, such as subcontractor costs and pricing agreements,

supplier costs, and other project-related costs.  (*Id.* ¶ 35.)  This work involved

Lawrence regularly communicating with supervisors and other Powerhouse

employees based in Pennsylvania.  (*See* Doc. 17-1, ¶ 43.)  Lawrence also accessed Powerhouse's internal data to "negotiat[e] contracts between Powerhouse and project owners, subcontractors, and suppliers."  (Doc. 9, ¶ 36.)  Powerhouse "developed and created" this internal, confidential data at its Pennsylvania headquarters and stored the data on servers located there.  (Doc. 17-2, ¶ 40.)

### C. Midstate Becomes a Powerhouse Subcontractor

In February 2022, Defendant Midstate Communication Contractors Inc. ("Midstate"), a Missouri corporation, completed an application to become a Powerhouse subcontractor.  (Doc. 9, ¶ 38; Doc. 17-2, p. 13.)  Powerhouse claims that it did not solicit Midstate's business.  (Doc. 17, p. 15.)  Thereafter, Powerhouse and Midstate executed several related contracts, including a subcontractor agreement, two pricing addenda to the subcontractor agreement, and a mutual nondisclosure agreement.  (Doc. 9-5; Doc. 9-6; Doc. 17-2, ¶¶ 34–35.)  Both the subcontractor agreement and the mutual nondisclosure agreement contain Pennsylvania choice-of-law provisions.  (Doc. 9-5, p. 7; Doc. 9-6, p. 3.)  The mutual nondisclosure agreement prohibits the parties' from using "Confidential Information . . . for the benefit of the recipient or others."  (Doc. 9-6, p. 2.)  The agreement also contains a non-solicitation clause, which prohibits Midstate and Powerhouse from "solicit[ing] eachother's [sic] customers, vendors or licensers,

clients or employees or disclos[ing] the Confidential Information to anyone." (*Id.* p. 3.)

Midstate's subcontractor work for Powerhouse was limited to projects in Arkansas and Iowa. (*See* Doc. 9, ¶ 77; Doc. 17-2, ¶ 36.) Midstate has never done any work in Pennsylvania, for Powerhouse or otherwise. (Doc. 12-1, ¶ 5.) Nevertheless, Midstate's communication with Powerhouse's Pennsylvania headquarters was important to its work as a subcontractor. As Powerhouse alleges, its chief operating officer and co-owner, Jeremy Houck, "directed work, gave instructions, and discussed bill payments and job pricing" with Midstate from Powerhouse's Pennsylvania headquarters. (Doc. 17-2, ¶ 36.) In general, Powerhouse's and Midstate's working relationship involved regular communication between Houck and Seth Barclay, Midstate's president. (*Id.*)

### D. Iowa Project with Windstream

In January 2023, Powerhouse entered a contract with Windstream Holdings, Inc. ("Windstream") to install fiber optic cables at an Iowa site ("Iowa Project"). (Doc. 9, ¶ 73.) Windstream was one of Powerhouse's regular business partners. The two companies had worked together in other states, including Georgia, New York, Nebraska, and Pennsylvania. (Doc. 9, ¶ 75.) For the Iowa Project, Midstate served as Powerhouse's subcontractor and Lawrence served as Powerhouse's project manager. (*Id.* ¶¶ 77–78.) Powerhouse had prepared Lawrence for

Windstream projects like the Iowa Project through trainings on Powerhouse's "confidential Windstream project management process," which covered "all aspects of managing Windstream projects—from start to finish." (Doc. 17-2, ¶ 41.) These trainings occurred in person at Powerhouse headquarters, in person in Iowa, and remotely over video conferencing software. (*Id.*)

A few months later, Midstate allegedly abandoned the Iowa Project after completing approximately one percent of its work. (Doc. 9, ¶¶ 84–85.) Powerhouse subsequently hired a replacement subcontractor to complete the Iowa Project. (*Id.* ¶ 87.) Nevertheless, Powerhouse alleges that it felt downstream effects from Midstate's purported dereliction. It allegedly caused Powerhouse to be unable to complete other Windstream projects in Iowa and "undermined Powerhouse's relationship with Windstream." (*Id.* ¶¶ 89–90.) It also allegedly caused Windstream not to award future contracts to Powerhouse. (*Id.* ¶ 91.) In fact, Windstream instead apparently awarded a different Iowa project directly to Midstate. (*Id.* ¶ 95.) This alleged solicitation of Windstream is at the heart of the present dispute.

Powerhouse alleges that Midstate "solicited, encouraged, or otherwise induced" Lawrence to work for Midstate and to misappropriate Powerhouse's confidential business information, including "confidential pricing information" and "Powerhouse's confidential Windstream project management process." (*Id.* ¶ 82,

83.)  Consequently, Lawrence allegedly began collaborating with and/or working for Midstate before and after his employment with Midstate ended in July 2023. (*Id.* ¶ 81.)  Midstate and Lawrence then together allegedly used Powerhouse's confidential information to solicit Windstream's business.  (*Id.* ¶ 92–93.) Powerhouse also alleges that Lawrence solicited two Powerhouse employees to work for Midstate.  (*Id.* ¶ 94.)  As a result of Lawrence's and Midstate's alleged actions, Powerhouse claims it lost future Windstream contracts throughout the country that it reasonably expected to obtain.  (*Id.* ¶ 96.)

## PROCEDURAL HISTORY

Powerhouse initially filed a complaint in the Pennsylvania Court of Common Pleas, and Defendants removed the state lawsuit to this court on April 3, 2024.  (Doc. 1).  Defendants then filed a motion to dismiss for lack of jurisdiction or, alternatively, to transfer venue.  (Doc. 6).  On May 1, 2024, Powerhouse responded with an amended complaint in which it alleges (1) breach of contract against Midstate (Count I); (2) two breach of contract claims against Lawrence (Counts II and III); (3) violations of the Pennsylvania Uniform Trade Secrets Act against Midstate and Lawrence (Counts IV and V); (4) tortious interference with existing business relations against Midstate (Count VI); (5) tortious interference

with prospective contractual relations against Midstate (Count VII); and (6) unfair competition against Midstate (Count VIII).[3]  (Doc. 9.)

In response, on May 15, 2024, Defendants filed the present motion to dismiss, along with a brief in support, for lack of personal jurisdiction, improper venue, and failure to state a claim.  (Docs. 11, 12.)  Powerhouse opposed the motion, and Defendants filed a reply brief.  (Docs. 17, 22.)  Powerhouse then requested leave to file a sur-reply brief, which was granted, and filed said sur-reply brief on August 9, 2024.  (Docs. 25–27.)  Thus, this motion is ripe for review.

## JURISDICTION

This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, since there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.  This court is also the proper venue, as explained below, pursuant to 28 U.S.C. § 1441(a).

## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants seek to dismiss this action for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2).  Defendants argue that this court cannot exercise personal jurisdiction over them for any of Powerhouse's claims.

---

[3] Powerhouse pleaded its unfair competition claim in the alternative to its Pennsylvania Uniform Trade Secrets Act claim against Midstate.

## A. Standard of Review

When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the court's jurisdiction over the defendant. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citing *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)).  "However, when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Id.*

A federal court sitting in Pennsylvania in a diversity suit exercises personal jurisdiction according to the law of Pennsylvania.  Fed. R. Civ. P. 4(k)(1)(A); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007).  The Pennsylvania long-arm statute provides for jurisdiction "based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States." 42 PA. CON. STAT. § 5322(b).

The Due Process Clause protects individuals from "being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  Thus, a forum state's ability to exercise personal jurisdiction over a defendant depends

on that defendant "hav[ing] certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).   From these principles, two theories of personal jurisdiction have emerged: general jurisdiction and specific jurisdiction.  *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358 (2021).

### 1.  General Personal Jurisdiction

Defendants are subject to general personal jurisdiction "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  A state in which an individual is domiciled may exercise general personal jurisdiction over that individual.  *Ford Motor Co.*, 592 U.S. at 358–59.  Apart from exceptional cases, a corporate entity is subject to general personal jurisdiction in "its place of incorporation and principal place of business."  *Id.* at 359.

There is no dispute that Midstate and Lawrence are not subject to general personal jurisdiction in Pennsylvania.  The amended complaint alleges that Midstate is a Missouri corporation with a principal place of business in Missouri and that Lawrence is domiciled in Arkansas.  (Doc. 9, ¶¶ 1–2.)  Accordingly, there

is no basis to subject Midstate or Lawrence to general personal jurisdiction in Pennsylvania.

### 2. Specific Personal Jurisdiction

Specific personal jurisdiction, on the other hand, is more limited.  A defendant is subject to specific personal jurisdiction only when a "claim arises from or relates to [the defendant's] conduct purposely directed at the forum state." *Marten v. Godwin*, 499 F.3d 290, 296 (3rd Cir. 2007).  Accordingly, the traditional test for specific personal jurisdiction consists of a three-part analysis: (1) whether defendants purposely directed their activities at the forum; (2) whether the claims arise out of or relate to the activities directed at the forum; and (3) whether assertion of jurisdiction "comports with 'fair play and substantial justice.'" *O'Connor*, 496 F.3d at 317 (3rd Cir. 2007) (quoting *Burger King Corp.*, 471 U.S. at 476).  This analysis is generally claim-specific, because specific personal jurisdiction arises from a relationship between a defendant's forum-state contacts and the claims.  *See Remick v. Manfredy*, 238 F.3d 248, 255 (3rd Cir. 2001).  Thus, the court will analyze separately specific personal jurisdiction as to the contract claims and the tort claims.[4]

---

[4] Although specific personal jurisdiction is generally analyzed on a claim-by-claim basis, "certain factually overlapping claims" need not be analyzed individually.  *O'Connor*, 496 F.3d at 317 n.3.  Given that Powerhouse's tort claims all depend on the same alleged misappropriation of confidential information, the court will not analyze those claims separately.  *See TorcUp, Inc. v. Aztec Bolting Servs., Inc.*, 386 F. Supp. 3d 520, 525 n.2 (E.D. Pa. 2019).

### i.  Contract Claims

#### a.  Defendants purposely directed their activities at Pennsylvania.

The first inquiry is whether Lawrence and Midstate purposefully directed contacts at Pennsylvania such that it can be said they purposely availed themselves of the privilege of operating here and, thus, benefitted from the protection of Pennsylvania's law.  *Burger King Corp.*, 471 U.S. at 475–76.  In contract cases, the analysis considers the totality of the contractual circumstances, "including the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing."  *Remick*, 238 F.3d at 256.

Here, Lawrence initiated the contractual relationship with Powerhouse when he submitted his employment application.  This weighs in favor of asserting jurisdiction over Lawrence.  *See Remick*, 238 F.3d at 256 (suggesting that reaching into a forum state to solicit a business relationship supports exercising jurisdiction); *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3rd Cir. 1992) (finding borrowers who initiated relationship with Pennsylvania bank "purposefully availed themselves of the privilege of conducting business in the Commonwealth").  In seeking employment with Powerhouse, Lawrence knew, or should have known, that he was entering into a relationship with a Pennsylvania company.  Lawrence signed a variety of company policies all bearing Powerhouse's Pennsylvania headquarters address.  The non-solicitation policy

Lawrence signed also bore this address.  Moreover, he traveled to Powerhouse's

Pennsylvania headquarters.  During his visit there, he picked up company-issued

vehicles registered in Pennsylvania for his use.  Lawrence's employment with

Powerhouse was not transitory; he worked for Powerhouse from 2021 to 2023.

*See Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 631 (E.D. Pa. 2015)

(considering relevant to personal jurisdiction analysis the fact defendants worked

for Pennsylvania plaintiff for two and a half years and one year and seven months,

respectively).

Furthermore, contacts with Pennsylvania appear to have been critical for

Lawrence's job.  During his employment, Lawrence maintained "regular[], if not

daily," communication with Powerhouse's Pennsylvania-based employees.  (Doc

17-2, ¶ 43.)  Lawrence needed access to internal Powerhouse data that was housed

on Powerhouse's Pennsylvania servers to carry out his job responsibilities.  Also,

all administrative aspects of Lawrence's employment, such as payroll and

employee benefits, were managed from Powerhouse's Pennsylvania location,

making contacts with Pennsylvania essential to his continued employment.  *See*

*Numeric Analytics, LLC v. McCabe*, 161 F. Supp. 3d 348, 355 (E.D. Pa. 2016)

(emphasizing that "all of the essential functions that allowed [d]efendants to earn a

living"—such as employee benefits, timekeeping, and pay— "were channeled

through Pennsylvania"); *see also M3 USA Corp. v. Hart*, 516 F. Supp. 3d 476, 494

(E.D. Pa. 2021) (considering relevant to personal jurisdiction analysis the fact "many of [an employer's] back-office functions occurred in Pennsylvania"). Under these circumstances, it can be said that Lawrence "deliberately 'reach[ed] out beyond one state and create[d] continuing relationships and obligations'" with Powerhouse so as to satisfy the purposeful availment requirement. *Burger King Corp.*, 471 U.S. at 473 (quoting *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp. Comm'n*, 393 U.S. 643, 647 (1950)).

As to Midstate, it too initiated a business relationship with Powerhouse, which it knew or should have known was a Pennsylvania company. Midstate's subcontractor agreement and the mutual nondisclosure agreement bore Powerhouse's Pennsylvania headquarters address. Both of those documents also contained Pennsylvania choice-of-law provisions. *See Burger King Corp.*, 471 U.S. at 482 (explaining choice-of law provisions should not be ignored when analyzing purposeful availment).

In addition to initiating the business relationship, Midstate relied on regular contacts with Powerhouse's Pennsylvania headquarters to facilitate the relationship. For instance, Powerhouse prepared in Pennsylvania the two pricing addenda to the subcontractor agreement, which were the results of negotiations between the two companies. (Doc. 17-2, ¶¶ 34–35.) So, too, Midstate's work appears to have depended on receiving directions from Powerhouse personnel in

Pennsylvania.  Under these facts, Midstate's contacts with Pennsylvania satisfy the purposeful availment test.

> **b. Powerhouse's contract claims arise out of or relate to Defendants' activities directed at Pennsylvania.**

The second inquiry is whether Powerhouse's breach of contract claims arise out of or relate to Lawrence's and Midstate's respective contacts with Pennsylvania.  In contract cases, "this test examines whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim."  *See O'Connor*, 496 F.3d at 319–20.  In other words, it examines "whether the defendant's contacts with the forum were instrumental in either the formation of the contract or its breach."  *Id.* at 320 (quoting *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3rd Cir. 2001)).

Here, both defendants, on their own accord, each sought out a business relationship with what they knew or should have known was a Pennsylvania company.  Thus, Lawrence's and Midstate's contacts with Pennsylvania were instrumental in forming the contracts at issue in this case—Lawrence's non-solicitation policy and Midstate's mutual nondisclosure agreement.  *Cf. Vizant Techs., Inc.*, 97 F. Supp. 3d at 631 (finding claims for breach of non-compete and confidentiality provisions related to defendants' securing employment with plaintiff).  The second prong of the test is, therefore, satisfied.

### c.  Assertion of jurisdiction comports with fair play and substantial justice.

Asserting personal jurisdiction over Defendants is "presumptively constitutional" once the first two parts of the analysis are satisfied; it is then Defendants' burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *O'Connor*, 496 F.3d at 324 (quoting *Burger King Corp.*, 471 U.S. at 477).  Only in rare cases is it unreasonable to assert jurisdiction over defendants who have "purposefully engaged in forum activities." *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 207 (3rd Cir. 1998) (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 116 (1987) (Brennan, J., concurring)).  Here, Lawrence and Midstate do not present any argument as to why jurisdiction would be unreasonable under this third part of the test.  They have, therefore, failed to present "a compelling case" to defeat specific personal jurisdiction.

### ii.  Tort Claims

In cases involving intentional torts, courts may exercise specific personal jurisdiction over defendants if either the traditional three-part test or the *Calder* effects test are satisfied.  The *Calder* test recognizes that "the unique relations among the defendant, the forum, the intentional tort, and the plaintiff may under certain circumstances render the defendant's contacts with the forum—which otherwise would not satisfy the requirements of due process—sufficient." *IMO*

17

*Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265 (3rd Cir. 1998) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)).  This is not to say that the *Calder* test "imposes a universally *lower* jurisdictional hurdle." *Hasson v. FullStory, Inc.*, No. 23-2535, 2024 WL 4049220, at *4 (3rd Cir. Sept. 5, 2024). Rather, the *Calder* test focuses on whether "the defendant expressly aimed its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *Miller Yacht Sales, Inc*, 384 F.3d at 99 (quoting *IMO Indus., Inc.*, 155 F.3d at 265).

Specifically, the *Calder* test requires three showings: (1) "[t]he defendant committed an intentional tort"; (2) "[t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort"; and (3) "[t]he defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity." *IMO Indus., Inc.*, 155 F.3d at 265–66.

The *Calder* test is not the exclusive jurisdictional test for intentional tort claims.  *See Hasson*, 2024 WL 4049220, at *4 (3rd Cir. Sep. 5, 2024). Nevertheless, both parties rely on the *Calder* test in making their jurisdictional arguments, and neither presents argument as to why the traditional test is or is not satisfied.  Since the court finds the *Calder* test is satisfied here, it need not consider the traditional test.

### a. The torts alleged in Powerhouse's amended complaint are intentional torts.

In its amended complaint, Powerhouse alleges the following tort claims: violations of the Pennsylvania Uniform Trade Secrets Act, tortious interference with existing business relations, tortious interference with prospective contractual relations, and in the alternative, unfair competition.  It is clear that these claims are intentional torts.

### b. Powerhouse felt the brunt of the alleged harm in Pennsylvania.

In analyzing the second part of the *Calder* test, district courts in this circuit have focused on where the trade-secrets owner resides, since "trade secrets are located . . . in the state where the owner resides."  *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co., Ltd.*, No. 2:15-cv-00965, 2020 WL 1526940, at *11 (E.D. Pa. Mar. 31, 2020) (citing *Paolino v. Channel Home Ctrs.*, 668 F.2d 721, 721 n.2 (3rd Cir. 1981)).  For instance, the court in *Cabot Corp. v. Niotan, Inc.* held that the brunt of the harm caused by misappropriation of a company's trade secrets was not Pennsylvania since that company was incorporated in Delaware and had its principal place of business in Massachusetts.  No. 08-cv-01691, 2011 WL 4625269, at *14 (E.D. Pa. Sept. 30, 2011); *see also, e.g.*, *PPG Indus., Inc.*, 2020 WL 1526940, at *12 (finding Pennsylvania the focal point of the harm caused by trade-secret misappropriation when the trade secrets were owned by a Pittsburgh-

headquartered company); *Gov't Emps. Ins. Co. v. Nealy*, 262 F. Supp. 3d 153, 166 (E.D. Pa. 2017) ("[T]he 'brunt of the harm,' under *Calder* . . . occur[s] in the states where the trade-secret owner is incorporated or headquartered."); *Eddie Kane Steel Prods., Inc. v. Ala. Plate Cutting Co.*, No. 18-cv-15167, 2019 WL 3281623, at *7 (D.N.J. July 19, 2019) (finding New Jersey the focal point of the harm caused by misappropriating trade secrets of New Jersey-incorporated company).

Here, Powerhouse is incorporated in Pennsylvania and stores the allegedly misappropriated trade secrets on servers that are physically located in Pennsylvania.  Therefore, Powerhouse felt the brunt of Defendants' alleged tortious conduct in Pennsylvania.

### c. Lawrence and Midstate expressly aimed their tortious conduct at Pennsylvania.

To satisfy the third element of the *Calder* test, a plaintiff must show: (1) "the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum;" and (2) "point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum."  *Marten*, 499 F.3d at 297–98 (quoting *IMO Indus., Inc.*, 155 F.3d at 266).  Here, Lawrence and Midstate each had involved, continuous relationships with Powerhouse.  Given this, it would be unreasonable to think Lawrence and Midstate did not know Powerhouse would feel the brunt of their alleged theft in Pennsylvania.  Thus, the issue is whether

Lawrence and Midstate each expressly aimed their tortious conduct at Pennsylvania.

District courts in this circuit have tended to find that defendants who steal trade secrets aim their conduct at the forum state in which the trade-secrets owner resides. For instance, in *Eddie Kane Steel Products*, an Alabama-based employee and Alabama-based company were subject to personal jurisdiction in New Jersey under the *Calder* test when they allegedly stole the New Jersey-based plaintiff's trade secrets. 2019 WL 3281623, at *7. That court reasoned that "if a defendant steals trade secrets from a plaintiff, the defendant expressly aims his or her tortious activity at the state where the plaintiff resides." *Id.* at *6. The *Cabot Corp.* court adopted similar reasoning. 2011 WL 4625269, at *15. That court explained the focal point of defendant's misappropriation of trade secrets "is where plaintiff's trade secrets are located and from where they were presumably stolen." *Id.*; *accord PPG Indus., Inc.*, 2020 WL 1526940, at *11 (reasoning the focal point of misappropriating trade secrets is where the trade secrets are located and, thus, the forum where plaintiff resides).

So, too, district courts in this circuit have found that out-of-state, remote employees who misappropriate their employer's trade secrets aim their tortious conduct at the employer's forum state. In *Vizant Technologies, LLC*, for example, the court found that Georgia-based employees expressly aimed their conduct at

21

Pennsylvania when they misappropriated a Pennsylvania-based company's trade secrets.  97 F. Supp. 3d at 632; *see also, e.g.*, *M3 USA Corp.*, 516 F. Supp. 3d at 498 (employee working remotely in New Jersey aimed tortious conduct at Pennsylvania when she misappropriated her Pennsylvania-based employer's trade secrets).

Based on these principles, the court is persuaded here that Lawrence and Midstate aimed their alleged tortious conduct at Pennsylvania.  Lawrence and Midstate both allegedly misappropriated confidential information and trade secrets to which it had access through its business relationship with Powerhouse.  Since the situs of Powerhouse's trade secrets is Pennsylvania, Defendants' aimed their tortious conduct at Pennsylvania when they allegedly stole the trade secrets.  Therefore, the third element of the *Calder* test is satisfied as to both Defendants, and the court may assert specific personal jurisdiction over them as it pertains to Powerhouse's tort claims.

## MOTION TO DISMISS FOR IMPROPER VENUE

Defendants also seek to dismiss this action for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), arguing that venue is improper under 28 U.S.C. § 1391(b).  Defendants' argument is unavailing, because that statue does not govern cases removed from state court.  Instead, venue in removed cases is governed by 28 U.S.C. § 1441(a).  *Polizzi v. Cowles Magazines, Inc.*, 345 U.S.

663, 665 (1953); *Chesapeake Thermite Welding, LLC v. R.R. Sols., Inc.*, 22-cv-02004, 2024 WL 387687, at *5 (M.D. Pa. Jan. 31, 2024).  Section 1441(a) states that an action "may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  This action was initially filed in the Pennsylvania Court of Common Pleas of Cumberland County.  Therefore, the Middle District of Pennsylvania is the proper venue, and the court will not dismiss the amended complaint for improper venue.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A. Standard

Defendants also seek to dismiss Powerhouse's state law tortious interference claims—Counts VI and VII—pursuant to Federal Rule of Civil Procedure 12(b)(6). In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir.

2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

## B. Tortious Interference with an Existing Contract (Count VI)

Defendants argue that dismissal of Count VI is necessary, in part, because Powerhouse failed to allege that Defendants' purported actions led Windstream to breach or otherwise fail to perform under Windstream's contract with Powerhouse for the Iowa Project.  (Doc. 12, p. 26.)  Powerhouse responds that it is not required to allege any such breach or failure to perform on Windstream's part.  (Doc. 17, p. 48.)  Even if it were, Powerhouse's argument continues, it has by alleging that Midstate's abandonment caused Windstream not to pay Powerhouse due to delays in Powerhouse's ability to complete other Windstream projects.  (*Id.*)

Powerhouse's argument misses the mark.  To explain why, an overview of Pennsylvania's adoption of the Restatement (Second) of Torts is needed.  Sections 766 and 766A of the Restatement (Second) of Torts concern tortious interference with an existing contract.  *Abraham v. Thomas Jefferson Univ.*, No. 20-cv-2967, 2024 WL 1120987, at *56 (E.D. Pa. Mar. 14, 2024).  Section 766 states, "[o]ne

who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person *by inducing or otherwise causing the third person not to perform the contract*, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." RESTATEMENT (SECOND) OF TORTS § 766 (Am. Law Inst. 1979) (emphasis added). Section 766A, on the other hand, states, "[o]ne who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, *by preventing the other from performing the contract or causing his performance to be more expensive or burdensome*, is subject to liability to the other for the pecuniary loss resulting to him." *Id.* § 766A (emphasis added).

The difference between Sections 766 and 766A concerns whom the defendant directs its conduct towards. As the Third Circuit has recognized, "[s]ection 766 addresses disruptions caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff. Section 766A addresses disruptions caused by an act directed at the plaintiff: the defendant prevents or impedes the plaintiff's own performance." *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3rd Cir. 1994) (quoting *Windsor Secs., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3rd Cir. 1993)).

Pennsylvania has "adopted the Restatement (Second) of Torts § 766," which "defines the tort of intentional interference with existing contractual relations." *Salsberg v. Mann*, 262 A.3d 1267, 1270 (Pa. Super. Ct. 2021) (citing *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1182 (Pa. 1978)). Pennsylvania has not adopted Section 766A, and the Third Circuit has predicted the Pennsylvania Supreme Court would not. *Gemini*, 40 F.3d at 66; *Phillips v. Selig*, 959 A.2d 420, 436 n.13 (Pa. Super. Ct. 2008) (noting Section 766A "has not been recognized by a Pennsylvania appellate court as the law of this Commonwealth"). Therefore, Pennsylvania does not recognize a tortious interference claim arising from a defendant's conduct directed at a plaintiff. So, for instance, a defendant's seizure of plaintiffs' merchandise, which rendered plaintiffs unable to fulfill certain contracts, could not be the basis for a tortious interference claim. *Safa v. City of Phila.*, No 13-cv-5007, 2014 WL 2011487, at *5–6 (E.D. Pa. May 16, 2014).

Here, Powerhouse's claim fits squarely within the scenario Section 766A contemplates. Powerhouse claims that Midstate abandoned the Iowa Project, "knowing that its abrupt work stoppage would interfere with the existing business relationship between Powerhouse and Windstream." (Doc. 9, ¶ 137.) Yet, Midstate was Powerhouse's subcontractor. Thus, Midstate's alleged abandonment would affect Powerhouse's ability to fulfill its contractual obligations to

Windstream.  Indeed, Powerhouse alleges it "had to hire a new subcontractor to complete the [Iowa Project]" and its inability to finish other Windstream jobs caused them to lose revenue, since Powerhouse is only paid for completed jobs. (*Id.* ¶¶ 87, 89.)  Powerhouse alleges no facts that would suggest Midstate directed conduct at Windstream concerning the Iowa Project.  Since Midstate's alleged conduct made it more difficult for Powerhouse to perform its contractual duties, the court will dismiss Count VI.

The court now must determine whether to dismiss Count VI with prejudice. Powerhouse is entitled to amend its complaint "unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3rd Cir. 2008).  Here, Powerhouse already amended its complaint, which it filed in response to Defendants' first motion to dismiss.  In their first motion to dismiss, Defendants proffered nearly identical arguments as to why the court should dismiss this claim.  After reviewing this argument in Midstate's first motion to dismiss, Powerhouse still failed to plead a viable claim in the first amended complaint. Moreover, neither of Powerhouse's pleadings detail how conduct directed at Windstream constituted tortious interference with the Iowa Project.  Given these considerations, a second amendment of this claim would be futile.  *See 44 Hummelstown Assocs., LLC v. Am. Select Ins. Co.*, 542 F. Supp. 3d 328, 342 (M.D. Pa. 2021) (finding amendment futile when plaintiff already amended its complaint

in response to a motion to dismiss and the "clear import" of plaintiff's allegations made it clear its claim was legally deficient).  Accordingly, the court will dismiss Count VI with prejudice.

### C. Tortious Interference with Prospective Contractual Relations (Count VII)

Four elements comprise a tortious interference with prospective contractual relations claim: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct."  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 184 (3rd Cir. 1997).  Defendants argue only that Plaintiff failed to allege sufficiently the first element—the existence of a prospective contractual relation.  The court disagrees.

The concept of a prospective contractual relation "has an evasive quality, eluding precise definition."  *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 471 (Pa. 1979).  Nevertheless, "a mere hope" does not satisfy this element.  *See id.* Rather, a claim will survive a motion to dismiss only if the plaintiff's allegations "establish a reasonable probability that but for the defendant's interference, a contract would have materialized."  *E. Frank Hopkins Seafood, Co. v. Olizi*, No. 2:17-cv-01558, 2017 WL 2619000, at *5 (E.D. Pa. June 17, 2017).

Powerhouse has sufficiently alleged a reasonable probability that a contract with Windstream would have come into existence but for Midstate's alleged interference.  Powerhouse alleges that it had an involved business relationship with Windstream that involved partnering on projects in "Georgia, Iowa, New York, Nebraska, and Pennsylvania."  (Doc. 9, ¶ 75.)  Yet, Powerhouse's expectation of future contracts with Windstream is not simply based on their past relationship. *Cf. Neopart Transit LLC v. CMB N.A. Inc.*, 314 F. Supp. 3d 628, 639 (E.D. Pa. 2018) (finding a "historical relationship" with clients insufficient to "establish a prospective contractual relationship").  Powerhouse instead alleges that it had conversations with Windstream about future projects for which Powerhouse would install fiber-optic networks.  Given the substantial working relationship between the two companies, it is reasonable to infer at this stage of the litigation that these communications were more substantive than speculative and gave rise to a reasonable probability of future contracts materializing.  In sum, Powerhouse's allegations establish that there was a reasonable probability of future contractual relations between Powerhouse and Windstream.  Thus, Powerhouse has carried its pleading burden on the first element, and Count VII of the amended complaint will proceed.

**ALTERNATIVE MOTION TO TRANSFER VENUE**

Defendants alternatively seek to transfer venue to the Western District of Missouri or the Western District of Arkansas, pursuant to 28 U.S.C. § 1406(a). (Doc. 12, pp. 29–30.)  That provision permits district courts to transfer, rather than dismiss, "cases laying venue in the wrong division or district."  28 U.S.C. § 1406(a).  Since venue is proper, as explained above, the court will not transfer the case to another venue.

**CONCLUSION**

For the reasons stated herein, the court finds that it can exercise specific personal jurisdiction over Defendants and that venue is proper in the Middle District of Pennsylvania.  Thus, the court will deny Defendant's motion to dismiss the amended complaint for lack of personal jurisdiction and improper venue.  The court will also deny Defendants' alternative motion to transfer venue.

The court further finds that Powerhouse's amended complaint fails to state a claim for tortious interference with existing contractual relations but succeeds in stating a claim for tortious interference with prospective contractual relations.  Therefore, the court will grant in part and deny in part Defendants' motion to dismiss Counts VI and VII for failure to state a claim.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September 20, 2024