## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POWERHOUSE COMMUNICATIONS, LLC, : | Civil No. 1:24-CV-00565 |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| MIDSTATE COMMUNICATION : | |
| CONTRACTORS, INC., and : | |
| CLAYTON LAWRENCE, : | |
| : | |
| Defendants. : | Judge Jennifer P. Wilson |

## MEMORANDUM

Plaintiff, Powerhouse Communications, LLC ("Powerhouse"), moves to dismiss the amended counterclaims filed by Defendant Midstate Communication Contractors, Inc. ("Midstate"). Powerhouse's motion requires the court to resolve two questions. The first is whether Midstate's counterclaims must be arbitrated pursuant to a binding arbitration agreement. The second is whether Midstate has adequately pleaded a breach of contract claim. For the reasons that follow, the court will not compel arbitration of Midstate's counterclaims, but it will dismiss without prejudice Midstate's breach of contract claim.

### BACKGROUND

The court has previously detailed the factual background alleged in Powerhouse's amended complaint. *Powerhouse Commc'ns, LLC v. Midstate Commc'ns Contractors, Inc.*, No. 1:24-CV-00565, 2024 WL 4253347, at *1–3

1

(M.D. Pa. Sept. 20, 2024). The court recounts here only those allegations that are necessary background to Midstate's counterclaims. The court's account of these facts are taken from Midstate's amended counterclaim complaint and other appropriate sources.[1] (Doc. 38.)

In February 2022, Midstate and Powerhouse entered into a written subcontract agreement for Midstate to work as a Powerhouse subcontractor on a project in Arkansas ("Subcontract Agreement"). (Doc. 38, p. 28.)[2] That same month, the parties executed a mutual nondisclosure agreement ("Mutual Nondisclosure Agreement"). (Doc. 9-6.) In its subcontractor role, "Midstate assisted Powerhouse with installing fiber-optic lines." (Doc. 9, ¶ 60.) This involved using techniques like "directional drilling or tunneling" in order "to place the fiber-optic lines and construct hand holes to access the lines for future service work." (*Id.*) Midstate alleges that the business relationship between the two parties ended in December 2022 once the Arkansas work under the Subcontract Agreement was complete. (Doc. 38, p. 29.)

---

[1] The court may consider "documents that are attached to or submitted with the [counterclaim], [] any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case" as well as facts in Powerhouse's complaint to the extent Midstate has admitted them. *1600 Walnut Corp. v. Cole Hann Co. Store*, 530 F. Supp. 3d 555, 558 (E.D. Pa. 2021) (quoting *Buck v. Hampton Twp. Sch. Dist.*, 452, F.3d 256, 260 (3d Cir. 2006)).

[2] For ease of reference, the court uses the page numbers from the CM/ECF header.

In April 2023, Midstate's President, Seth Barclay, allegedly reached out to Powerhouse's COO, Jeremy Houck, "to express interest in performing new subcontract work for Powerhouse in Iowa." (*Id.*) Sometime thereafter, the parties allegedly entered into an oral contract for Midstate to work as Powerhouse's subcontractor at a project in Iowa ("Oral Contract"). (*Id.*)

This Iowa project gives rise to the parties' present dispute. On the one hand, Powerhouse alleges that Midstate abandoned its work on the project and began soliciting Defendant Clayton Lawrence ("Lawrence"), one of Powerhouse's employees, "to bring Powerhouse's confidential, non-public, and sensitive information . . . with him when he began working for Midstate." (Doc. 9, ¶¶ 83–84.) On the other, Midstate alleges that it performed its obligations under the Oral Contract, invoiced Powerhouse for the work, and never received payment for that invoiced work. (Doc. 38, p. 30.)

On February 28, 2024, Powerhouse sued Midstate in the Pennsylvania Court of Common Pleas. (Doc. 1.) Midstate then removed the action to this court on April 3, 2024. (*Id.*) Midstate timely filed its answer and counterclaims on October 4, 2024, which it later amended on December 13, 2024. (Docs. 30 & 38.) Midstate alleges two counterclaims, one for breach of contract and one, in the alternative, for unjust enrichment. (Doc. 38, pp. 30–32.) Powerhouse moved to

dismiss these counterclaims on January 10, 2025. (Doc. 42.) Powerhouse's

motion is fully briefed and ripe for resolution. (*See* Docs. 45, 50, 59.)

JURISDICTION

The court has subject matter jurisdiction over this matter pursuant to 28

U.S.C. § 1332(a), because there is complete diversity of citizenship among the

parties and the amount in controversy exceeds $75,000. Venue properly lies in this

court pursuant to 28 U.S.C. § 1441(a).

STANDARD OF REVIEW

### A. Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") provides the "body of federal

substantive law establishing . . . the duty to honor agreements to arbitrate

disputes." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584

F.3d 513, 522 (3d Cir. 2009). Section 2 of the FAA states that "[a] written

provision in ... a contract evidencing a transaction involving commerce to settle by

arbitration a controversy ... arising out of such contract or transaction ... shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in

equity for the revocation of any contract." 9 U.S.C. § 2. Under Section 4, "[a]

party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate

under a written [arbitration] agreement ... may petition any United States district

4

court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

Generally, "in deciding whether a party may be compelled to arbitrate under the FAA, [courts must] consider '(1) whether there is a valid agreement to arbitrate between the parties and, if so, (2) whether the merits-based dispute in question falls within the scope of that valid agreement.' " *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 (3d Cir. 2014) (quoting *Century Indem.*, 584 F.3d at 527).  The legal standard that applies to motions to compel arbitration depends on the circumstances.  *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 316 (W.D. Pa. 2020).

District courts review motions to compel arbitration under the rubric of either Rule 12(b)(6) or Rule 56 of the Federal Rules of Civil Procedure.  In *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764 (3d Cir. 2013), the Court of Appeals for the Third Circuit explained that "when it is apparent, based on 'the face of the complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause,' a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay."  *Id.* at 776 (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)).  Conversely, "if the complaint and its supporting documents are unclear regarding

5

the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question'" under the Rule 56 standard. *Id.* (emphasis added) (alteration in original). Thereafter, if summary judgment is not warranted, the court may proceed summarily to a trial. *Id.* (quoting 9 U.S.C. § 4).

### B. Motion to Dismiss for Failure to State a Claim

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss. *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79). To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines

whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

## DISCUSSION

Powerhouse seeks dismissal of Midstate's counterclaims for two primary reasons. First, Powerhouse argues that Midstate's claims are subject to arbitration pursuant to the arbitration clause contained in the Subcontract Agreement ("Arbitration Clause"). (Doc. 45, pp. 15–24.) Second, Powerhouse argues that Midstate has failed to adequately state a claim for breach of contract. (*Id.* at 25–27.) The court considers these arguments *seriatim*.

### A. Powerhouse has waived its right to arbitrate Midstate's counterclaims.

Powerhouse's motion to compel arbitration is predicated on the theory that Midstate should be compelled to arbitrate its claims under the Oral Contract pursuant to the Arbitration Clause. Before the court can consider the merits of this theory, a threshold issue must be addressed. In its brief in opposition, Midstate argues that Powerhouse has waived its right to compel arbitration by initiating a lawsuit on claims also subject to the same Arbitration Clause. (Doc. 50, pp. 11–14.) The court agrees with Midstate.

The right to compel arbitration is a contractual right, *Demchak Partners Ltd. v. Chesapeake Appalachia, LLC*, No. 3:13-CV-2289, 2014 WL 4955259, at *5

(M.D. Pa. Sept. 30, 2014), and treated no differently than other contractual rights. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) ("[A] court must hold a party to its arbitration contract just as the court would to any other kind."). This includes with respect to waiver. *See id.* ("If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it."); *accord White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 339 (3d Cir. 2023) ("[T]he inquiry for waiver of arbitration rights must be identical to the inquiry for waiver of other contractual rights.") Accordingly, a party waives its right to arbitrate, like any contractual right, if that party "intentional[ly] relinquish[ed] or abandon[ed] . . . [its] known right." *White*, 61 F.4th at 339 (quoting *Morgan*, 596 U.S. at 417). In considering waiver, a "court focuses on the actions of the person who held the right," *Morgan*, 596 U.S. at 417, and "the 'circumstances and context of each case.'" *White*, 61 F.4th at 339 (quoting *Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (3d Cir. 2011)).

To discern whether Powerhouse waived its right to arbitrate, the court must consider two questions. The first is whether Powerhouse had a right to arbitrate its present claims, *i.e.*, whether its claims are subject to the Arbitration Clause. If so, the court then must consider whether Powerhouse's conduct evidences a relinquishment or abandonment of its right to arbitrate.

### 1. Powerhouse's claims are subject to the Arbitration Clause.

Powerhouse brings the following claims against Midstate: breach of contract, violation of the Pennsylvania Uniform Trade Secrets Act, tortious interference with existing business relations and prospective contractual relations, and unfair competition in the alternative.  (Doc. 9, ¶¶ 98–103, 126–53.)  In short, Powerhouse bases its claims on allegations that Midstate solicited Lawrence, misappropriated Powerhouse's trade secrets and confidential information, and interfered in the existing and prospective contractual relationships between Powerhouse and its customers.  (*See id.*)  The claims arise mostly in the context of the Iowa project.

Facially, it is ambiguous whether the Subcontract Agreement for the Arkansas project governed Midstate's work on the Iowa Project.  The contract language suggests its scope might be limited to the Arkansas project.  (*See* Doc. 9-5, p. 2.)  Regardless, Powerhouse's position in this lawsuit is that the Subcontract Agreement governed the parties' relationship with respect to both the Arkansas and Iowa projects.  (Doc. 45, p. 24.)[3]  Midstate seemingly accepts Powerhouse's

---

[3] In general, Powerhouse's theory is that the Arbitration Clause applies to disputes arising from the Oral Contract, because the Oral Contract "grew from the general contractor-subcontractor relationship" and "was reached during the pendency of the Subcontract Agreement."  (Doc. 59, p. 15.)  Powerhouse primarily relies on *Hautz Construction, LLC v. H & M Department Store*, Civil No. 12-3478, 2012 WL 5880370 (D.N.J. Nov. 20, 2012), to support its theory.

position, *arguendo,* in advancing its waiver argument.[4]  (Doc. 50, pp. 11–14.)

Therefore, the court will assume, without deciding, that Powerhouse is correct for

purposes of analyzing waiver.

The court now must look to the Arbitration Clause's language to determine

whether Powerhouse's claims fall within its ambit.  *Hinnant v. Am. Ingenuity, LLC*,

554 F. Supp. 2d 576, 586 (E.D. Pa. 2008).  The Arbitration Clause states:

> 20. Arbitration: Any controversy or claim arising out of or relating to
> this Subcontract, or the breach thereof, shall be settled by arbitration in
> accordance with the Construction Industry Arbitration Rules of the
> American Arbitration Association, and judgment upon the award
> rendered by the arbitrator(s) may be entered in any court having
> jurisdiction thereof.

(Doc. 9-5, p. 6.)  The phrases "arising out of" and "relating to" call for "expansive

interpretation."  *Medtronic AVE Inc. v. Cordis Corp.*, 100 Fed. App'x 865, 868 (3d

Cir. 2004); *see TMG Health, Inc. v. UnitedHealth Grp., Inc.*, Civil No. 07-115,

2007 WL 1258133, at *1 (E.D. Pa. Apr. 27, 2007) (describing arbitration clause

containing "arising out of or relating to" language as "of the broadest nature").  An

---

[4] Midstate's primary position is that the Subcontract Agreement did not govern the parties'
relationship on the Iowa project.  (Doc. 50, pp. 14–15.)  This position supports Midstate's
argument that the Arbitration Clause does not extend to its counterclaims, but undermines its
argument that Powerhouse waived its right to arbitrate by initiating litigation on claims subject to
the Arbitration Clause, since Powerhouse's claims arise mostly from the Iowa project.
Therefore, the court interprets Midstate's waiver argument as an argument made in the
alternative under the assumption that the Subcontract Agreement governed the parties'
relationship vis-à-vis the Iowa project.  *See Intel Corp. v. Future Link Sys., LLC*, 268 F. Supp. 3d
605, 614 (D. Del. 2017) ("[A]lternative arguments, and arguments analyzed under an opposing
party's interpretation of the claims, are permissible.").

arbitration clause that uses such language "overwhelmingly suggests that a given dispute is arbitrable."  *Id.*; *accord Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004).

Powerhouse attempts to avoid the expansive reach of the Arbitration Clause by arguing that its claims arise only under the Mutual Nondisclosure Agreement, which Powerhouse insists exclusively governed "Midstate's use of Powerhouse's confidential information."  (Doc. 59, p. 23.)  According to Powerhouse, the Arbitration Clause has no applicability to its claims since its causes of action arise independently of the Subcontract Agreement.  (*Id.* at 24.)  Powerhouse is mistaken.

Powerhouse wants the court to myopically focus on the legal theories of its claims.  Yet, in analyzing whether claims are subject to an arbitration clause, courts "focus [ ] on the factual underpinnings of the claim rather than the legal theory alleged in the complaint."  *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 173 (3d Cir. 2014) (quoting *Medtronic AVE, Inc. v. Advances Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001)).  Courts do so to "prevent[ ] a creative and artful pleader from drafting around an otherwise-applicable arbitration clause."  *Id.* (quoting *Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009)).

Powerhouse's claims are collectively predicated on the following factual allegations: (1) Midstate had a duty not to solicit Powerhouse's employees or

customers, yet did so anyway; (2) Midstate had a duty to complete its work on the Iowa project, yet deliberately refused to do so in order to hurt Powerhouse's current and prospective relationships with its customers; and (3) Midstate had a duty not to misappropriate or reveal Powerhouse's confidential information and trade secrets, yet did so anyway. (*See* Doc. 9, ¶¶ 98–103, 126–53.)

These factual underpinnings clearly implicate the Arbitration Clause. All of Powerhouse's claims necessarily arise from the business relationship and Subcontract Agreement it had with Midstate. But for that relationship and the Subcontract Agreement, none of Powerhouse's claims would exist. For instance, Midstate could not have allegedly interfered with the relationships between Powerhouse and its customers by refusing to complete its work on the Iowa project if the Subcontract Agreement, which Powerhouse claims governed that work, never existed.

The Eastern District of Pennsylvania came to a similar conclusion in a comparable case. In *Medversant Technologies, LLC v. Leverage Health Solutions, LLC*, 114 F. Supp. 3d 290 (E.D. Pa. 2015), the plaintiff sued defendants for, among other claims, tortious interference with contract and misappropriation of trade secrets. *Id.* at 294. The defendant had entered into a business development and marketing agreement, which included an arbitration clause covering "[a]ny disputes that arise between the parties with respect to the performance of this

agreement." *Id.* at 293, 297.  Pursuant to that agreement, the plaintiff directed the defendant to negotiate the plaintiff's purchase of a third-party company.  *Id.* at 293. The defendant, instead, purchased the third-party company itself.  *Id.* at 294. Looking at the factual underpinnings of the plaintiff's claims, the *Medversant* court determined that such claims fell within the scope of the parties' arbitration clause, because the parties' agreement was necessarily the reason the claims existed in the first place.  *Id.* at 298.  Without the agreement, the defendant would have been free to purchase the third-party company and doing so would not have been tortious. *Id.*  The court finds this reasoning persuasive here.

Moreover, Powerhouse's argument that Midstate breached duties arising solely from the Mutual Nondisclosure Agreement does little to help its cause for two reasons.  First, the court is unconvinced that Powerhouse's claims arise solely under the Mutual Nondisclosure Agreement and independently of the Subcontract Agreement.  The non-solicitation clause in the Mutual Nondisclosure Agreement is included verbatim in the Subcontract Agreement.  (*Compare* Doc. 9-5, p. 5, *with* Doc. 9-6, p. 3.)  Therefore, it appears that both contracts imposed the same non-solicitation duties on Midstate.  Powerhouse cannot simply fashion or characterize the legal theories of its claims to avoid arbitration.

Second, the Arbitration Clause's broad language does not require claims to be brought under the specific terms of the Subcontract Agreement for them to be

subject to arbitration.  In this respect, the court finds persuasive the reasoning of *Dumont Aircraft Charter, LLC v. Valvano*, 672 F. Supp. 3d 1 (M.D. Pa. 2023).  In that case, a plaintiff and defendant executed a settlement agreement, which included an arbitration clause with similar language to the one at bar.  *Id.* at 5, 12.  Under the settlement agreement, the plaintiff loaned to the defendant $400,000 and, in return, received a promissory note and mortgage.  *Id.* at 6.  Eventually, the defendant breached the terms of the promissory note.  *Id.* at 5.  The plaintiff attempted to avoid the arbitration clause in the settlement agreement by arguing that its claims arose from the promissory note and mortgage, which were independent, "stand-alone" documents.  *Id.* at 10.  The court rejected this argument, reasoning that the settlement agreement's arbitration clause did not require claims be brought under "specific terms of the [s]ettlement [a]greement" and that the promissory note and mortgage were issued "to effectuate the [s]ettlement [a]greement."  *Id.* at 12.  The court finds this reasoning persuasive and will reject Powerhouse's similar arguments on the same grounds.

In sum, Powerhouse attempts to distance its claims from the Arbitration Clause through artful pleading.  Yet, the court concludes, looking at the factual underpinnings of Powerhouse's claims, that those claims are subject to the Arbitration Clause.

## 2. Powerhouse waived its right to arbitrate by initiating this lawsuit.

The question then becomes whether Powerhouse waived its right to arbitrate by initiating the present litigation against Midstate. The answer must be yes. Powerhouse affirmatively chose to litigate its arbitrable claims in this court. And, in doing so, it intentionally abandoned its right to arbitrate. Powerhouse cannot now seek to enforce that right with respect to Midstate's counterclaims. *See Pirito v. Penn Eng'g World Holdings*, 833 F. Supp. 2d 455, 468 (E.D. Pa. 2011) (finding that plaintiff waived his right to arbitrate defendant's counterclaims when plaintiff first sued defendant for a breach of contract claim that squarely fell within the parties' arbitration clause).

For the reasons stated above, the court finds that Powerhouse has waived its right to arbitrate Midstate's counterclaims. Thus, the court will deny Powerhouse's motion to compel arbitration.

## B. Midstate has not adequately pleaded a breach of contract claim.

The court now considers whether Midstate has adequately alleged a breach of contract claim against Powerhouse. Under Pennsylvania law, a breach of contract claim has three elements: "(1) 'the existence of a contract, including its essential terms'; (2) 'a breach of a duty imposed by the contract'; and (3) 'resultant damages.'" *Fortunato v. CGA Law Firm*, No. 17-CV-00201, 2018 WL 4635963, at *3 (M.D. Pa. Sept. 27, 2018) (quoting *Gorski v. Smith*, 812 A.2d 683, 692 (Pa.

15

Super. Ct. 2002)).  Powerhouse argues that Midstate has failed to adequately allege the essential terms of the Oral Contract.  (Doc 45, pp. 25–27.)  The court agrees.

Pleading the essential terms of a contract requires identifying terms "such as time or manner of performance, price to be paid, [and] the like." *Lemons v. Meguerian*, No. 23-1090, 2024 WL 1328311, at *3 (3d Cir. Mar. 28, 2024) (quoting *Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956)). Clear pleadings are "particularly important" when a party alleges the existence of an oral contract. *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006).  Specifically, it is especially important for the pleading party to "identify in as specific detail as possible the date of the agreement and the individuals involved." *Pratter v. Penn Treaty Am. Corp.*, 11 A.3d 550, 563 (Pa. Commw. Ct. 2010).

Here, Midstate has failed to allege several key terms.  First, Midstate does not allege the individuals involved in forming the Oral Contract.  It merely states that "Powerhouse and Midstate entered into" the Oral Contract.  (Doc. 38, p. 29.) Although Midstate alleges that in April 2023, its President "express[ed] interest" to Powerhouse's COO "in performing new subcontract work for Powerhouse in Iowa," *id.*, this is merely indicative of contract negotiation, not formation. *See Lazer & Lazer Corp. v. Agronomed Pharm. LLC*, 618 F. Supp. 3d 186, 199 (E.D. Pa. 2022) (quoting *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F.

App'x 194, 201 (3d Cir. 2012)) (explaining that under Pennsylvania law, "engaging in negotiations . . . does not create an enforceable contract").

Midstate also fails to allege adequately what its duties were under the Oral Contract. Midstate simply alleges that the parties came to an oral agreement for Midstate to work as a subcontractor on a project in Iowa commencing in May 2023. (Doc. 38, p. 29.) Midstate does not allege what the parties agreed would be the actual terms of Midstate's work. Midstate's failure in this regard makes it impossible for the court to analyze the factual basis for Midstate's contention that it fully performed under the Oral Contract. *Cf. Bill Goodwin Constr., LLC v. Wondra Constr., Inc.*, No. 3:13-CV-157, 2013 WL 4005307, at *4 (M.D. Pa. Aug. 5, 2013) (dismissing breach of contract claims when plaintiff alleged that it entered into an oral contract, yet simply described its own contractual duties as "securing materials, work and equipment to help build roads for [a] project").

Midstate argues that its claim should survive, because Powerhouse has admitted in this proceeding that some contract existed between them with respect to the Iowa project. (Doc. 50, p. 18.) The court interprets this as an argument for the application of judicial estoppel. *See Semper v. Gomez*, 747 F.3d 229, 247 (3d Cir. 2013) (quoting *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010)) ("Judicial estoppel . . . rests on the basic notion that, 'absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then

17

seek an inconsistent advantage by pursuing an incompatible theory.'").  Yet,

Midstate's argument is two sentences long and fails to define, let alone apply, the

applicable standard for judicial estoppel.  *See generally In re ESML Holdings Inc.*,

135 F.4th 80, 92 (3d Cir. 2025) (elucidating three elements that must exist to

warrant judicial estoppel).  Accordingly, the court will not entertain Midstate's

estoppel argument.  *See Scopelliti v. Traditional Home Health & Hospice*, No.

3:18-CV-00040, 2018 WL 1899294, at *5 (M.D. Pa. Apr. 20, 2018) ("This Court

is not required to consider arguments that have not been developed by the party

advancing them.").

Since Midstate has failed to allege adequately the essential terms of the Oral

Contract, the court will dismiss its counterclaim for breach of contract.  The

dismissal will be without prejudice, because the court cannot conclude that

amendment would be futile or inequitable.  *See G.S. v. Penn-Trafford Sch. Dist.*,

813 F. App'x 799, 803 (3d Cir. 2020) (quoting *Phillips v. County of Allegheny*, 515

F.3d 224, 236 (3d Cir. 2008)) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal,

a district court must permit a curative amendment, unless an amendment would be

inequitable or futile.").

CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part Powerhouse's motion to compel arbitration and to dismiss the first amended counterclaims.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: September17, 2025

19